1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

TRUE TRADITIONS, LC,

        Appellant,

    v.

CAROL WU, et al.,

        Appellees.

Case No.  14-cv-03605-BLF

A.P. No. 13-5062 SLJ

**ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT**

      Appellant True Traditions, LC ("Appellant" or "TT") appeals the judgment of the bankruptcy court avoiding a fraudulent conveyance of real property located at 415-417 Tehama Street, San Francisco, California ("Tehama Property").  For the reasons stated herein, the judgment of the bankruptcy court is AFFIRMED.

## I.   BACKGROUND

### A.   Factual and Procedural Overview of this Case

      This adversary proceeding stems from two bankruptcy cases involving a debtor, Richard ("Rick") Louie, Jr.,[1] who has gone to extraordinary lengths to conceal his assets.

      On May 3, 2013, Appellee Carol Wu, the chapter 7 trustee for the individual bankruptcy estates of Rick and his wife, Stephanie Chan, filed the originating complaint in the underlying adversary proceeding in bankruptcy court seeking declaratory relief and to avoid fraudulent transfer.  Appellees' App. (hereinafter "ER"), ECF 24, Exh. 1.  The complaint asserted that Rick and Stephanie had failed to disclose as their personal assets a brokerage account at Merrill Lynch;

---

[1] This order uses individuals' first names for ease of reference; the Court intends no disrespect by this informal mode of address.

United States District Court
Northern District of California

1  that funds from the Merrill Lynch account had been used to purchase the Tehama Property in the

2  name of Rick's mother, Mary Louie; that Mary then executed a grant deed transferring her fee title

3  interest in the Tehama Property to Appellant True Traditions, LC, a purported New Mexico

4  limited liability company, for no consideration; and that Rick, Stephanie, Mary, or TT might claim

5  ownership over the Tehama Property.  *Id.* ¶¶ 8-13.  Appellee Wu accordingly sought a declaration

6  that the Tehama Property belonged to the bankruptcy estate and to, among other things, avoid any

7  transfer of interests in the Merrill Lynch account and Tehama Property made within two years of

8  the filing of the complaint.

9       On June 28, 2013, Appellee Linda Green, the chapter 11 trustee for the bankruptcy estate

10  of Homer Ventures LLC, a limited liability company formed and controlled by Rick, filed a

11  motion to intervene in the Tehama Property action.  ER Exh. 2.  That motion was granted, and the

12  two trustees filed their combined complaint-in-intervention on August 1, 2013 naming Rick,

13  Stephanie, Mary, and TT as defendants.  ER Exh. 3.  The trustees eventually entered into a

14  settlement whereby trustee Green would prosecute this lawsuit and agree to split any recovery

15  with trustee Wu.  *See* ER Exh. 16 (Bankruptcy Court's Order Following Trial (hereinafter "Trial

16  Order")) at 2.  On January 15, 2014, the bankruptcy court also approved a joint stipulation of

17  partial dismissal, through which the trustees agreed to dismiss Rick, Stephanie, and Mary without

18  prejudice and pursue their declaratory relief and fraudulent transfer claims solely against

19  Appellant TT.  ER Exh. 6.

20       Appellant and Mary—represented by the same counsel—filed several motions thereafter.

21  Appellant moved to dismiss the action for "lack of jurisdiction/authority" on January 27, 2014.

22  ER Exh. 7.  Mary filed a motion to intervene in the adversary proceeding as a plaintiff on February

23  19, 2014 on the assertion that she owned the Tehama Property and could prove that ownership

24  through a tracing of funds.  ER Exh. 8.  The bankruptcy court heard oral argument on both

25  motions on March 31, 2014.  With respect to the motion to dismiss, the bankruptcy court

26  observed:

27          The Court would like to point out that Defendants' argument here
           that the Court has no jurisdiction conflicts with the answer filed in
28          this case, in which it admitted the Court had jurisdiction.  Somewhat

1   confusingly, the answer to the complaint in intervention, Defendant
    denied the Court had jurisdiction, even though both complaints
2   consist of the same allegations and the same causes of action.
    Regardless, as explained earlier, the issue is not whether the Court
3   has jurisdiction, but rather, whether the Court can enter a final
    judgment.

4   3/31/14 Hr'g Tr. 6:9-18.  On that basis, the bankruptcy court denied Appellant's motion to

5   dismiss.  ER Exh. 9.  As to Mary's motion to intervene, the bankruptcy court considered Mary's

6   arguments for intervention as of right and permissive intervention and rejected them both.  In so

7   doing, the court found that Mary's application was untimely, 3/31/14 Hr'g Tr. 11:6-10, and that

8   intervention would complicate the proceedings—which were close to trial—and prejudice the

9   plaintiff-trustees, *id.* 11:11-12.  Furthermore, the court found that Mary had no "protectable

10  interest" in the Tehama Property:

11          [T]he Defendants, including Mary Louie, admitted in their original
            answer to the complaint in January 2013 that Mary Louie executed a
12          grant deed transferring title to Tehama to True Traditions.  Under
            both California and New Mexico law, Mary no longer owns the
13          Tehama property even if she is a hundred percent owner of True
            Traditions.  True Traditions owns the property.  Therefore Mary has
14          no legal – no protectable legal interest in that property, if it's based
            only on the claim that she owns True Traditions.
15

16  *Id.* 13:10-19.  The court also rejected Mary's alternative argument that she has an equitable

17  interest in the Tehama Property arising out of a constructive trust, explaining:

18          Movant insists that Mary can assert a constructive trust.  Under
            California law, a constructive trust may be imposed on property as a
19          remedy for things wrongfully detained. . . .  Movant appears to
            argue that Mary satisfies the requirement for a constructive trust
20          because she can prove the funds used to purchase Tehama can be
            traced to her.  The Ninth Circuit decided a similar tracing theory in
21          *In re Advent Management* . . . [and] found that the mere tracing of
            funds to a new entity was not sufficient to impose a constructive
22          trust.  The Circuit concluded that only money that was wrongfully
            acquired or detained by a person by a wrongful act would result in
23          the imposition of a constructive trust.  Mary Louie does not allege
            any wrongful act.  The fact that Mary's monies may have been used
24          to purchase the property in and of itself does not give rise to the
            imposition of a constructive trust.
25

26  *Id.* 13:21-14:15.  In sum, the court found that any interest Mary personally had in the Tehama

27  Property was, "[a]t best, . . . an interest in True Traditions as the member of that company."  *Id.*

28  14:22-24.  On the basis of that reasoning, the bankruptcy court concluded that any interest Mary

3

1    had in the property could be adequately represented by TT and its counsel. *Id.* 15:13-24, 16:1-
2    17:2. The motion to intervene was accordingly denied. ER Exh. 10.

3         The parties then filed cross-motions for summary judgment, with Appellant affirmatively
4    seeking judgment as a matter of law that "at least 89.3% of the Tehama property is equitably
5    owned by True Traditionis, L.C. [sic] and/or Mary Louie" and that "as of October 1, 2009, 89.3%
6    of the monies in the Merrill Lynch Account was not an 'interest in the debtor [Rick Louie] in
7    property." ER Exh. 12 at 2. The bankruptcy court granted summary adjudication for Appellees
8    on certain facts not in material dispute. ER Exh. 13 (Order on Cross Mots. for Summary J.
9    (hereinafter, "MSJ Order")) at 9-10. The court denied Appellant's cross-motion, finding that there
10   were disputed "material issues of fact" on Appellant's tracing evidence that may require the
11   testimony of expert witnesses. *Id.* at 9.

12        The case then proceeded to two-day bench trial on June 9 and 10, 2014. On July 14, 2014,
13   the bankruptcy court entered its post-trial order finding for Appellees and ordering that title to the
14   Tehama Property be reformed and placed in the name of the chapter 7 estate of Rick and
15   Stephanie for administration by the trustee-Appellees. ER Exh. 16 (Order Following Trial
16   (hereinafter, "Trial Order")). On July 28, 2014, the bankruptcy court entered its Judgment
17   Avoiding Fraudulent Transfer. ER Exh. 17. This appeal followed.

18        **B.    Transactional History of the Tehama Property**

19        A little background on the origins of the Tehama Property is necessary to understand the
20   convoluted arguments in this case. The essential facts are set forth in the bankruptcy court's Trial
21   Order, are largely undisputed, and are well-founded in the record.

22        **i.    The Sav-Mor Grocery store and the Buffalo Properties**

23        In May 2003, Mary Louie and Richard Louie, Sr. sold a grocery store they owned and
24   operated in Williams, California ("Sav-Mor Grocery") for $280,000. Out of the proceeds of that
25   sale, Mary and Richard Sr. purchased two investment properties at 965 Amherst Street and 241
26   West Utica Street, Buffalo, New York (collectively, "The Buffalo Properties"). The properties
27   were purchased for $695,000 through a 1031 tax free exchange. This meant the sale deferred
28   Richard Sr.'s and Mary's gains on the sale of the grocery store until the Buffalo Properties were

United States District Court
Northern District of California

4

1    sold.  Title to both of the Buffalo Properties was taken in the names of four individuals: Richard

2    Sr., Mary, Rick (Richard Sr.'s and Mary's only child), and Stephanie.

3         Even before the sale of the Sav-Mor Grocery, on February 27, 2003, Richard Sr., Mary,

4    Rick, and Stephanie entered into a Partnership Agreement, supposedly in connection with the

5    purchase of the Buffalo Properties.  Pl. Trial Exh. 9.[2]  This one-page agreement stated that Richard

6    Sr. and Mary would be repaid their investment in the Buffalo Properties and that the four owners

7    would divide amongst themselves funds generated by the properties, but only after paying Rick a

8    6% management fee.  *Id.*  The bankruptcy court observed that "the document is very brief, and

9    does not contain many of the usual terms one would associate with such an agreement."  Trial

10   Order at 4.  Furthermore, Appellees presented unrebutted testimony at trial from its expert, Ms. M.

11   Patricia Fisher, that Mary's signature on the agreement was a forgery.  *Id.*; *see also* Pl. Trial Exh.

12   2 at 4-8.[3]  In light of the sparse terms and the evidence of forgery, the bankruptcy court concluded

13   that the Partnership Agreement "is not authentic" and disregarded it.  Trial Order at 4.

14        On June 15, 2003, Richard Sr. and Mary executed grant deeds transferring ownership of

15   the Buffalo Properties to Rick and Stephanie.  The deeds state that consideration of $1.00 was

16   paid.  Richard Sr. passed away in October 2003.  The grant deeds were not recorded until June 11,

17   2007.[4]  *See* Pl. Trial Exhs. 13, 14.

18        In the bankruptcy court's words, "[w]hatever the chain of title on the Buffalo Properties,

19   the next steps were conducted solely by Rick Louie and Stephanie Chan."  Trial Order at 4.  On

20   July 17, 2007, Rick and Stephanie sold the two Buffalo Properties to a third party for $690,000.

21

22   ---

     [2] Filed as part of Appellees' designation of the record on appeal at ECF 32-34.

23

24   [3] Page numbering used is Appellees' numbering for the report as trial exhibit, and not the original
     page numbers in the report.

25   [4] For unknown reasons, Richard Sr., Mary, Rick, and Stephanie created a conflicting deed on May
     12, 2004 transferring the Buffalo Properties to Flanders Ventures, LLC.  Flanders Ventures, LLC
26   was another one of Rick's limited liability company.  This transaction is of limited relevance to
     the issues before the Court, as the bankruptcy court ignored the transaction noting that Appellant
27   did not argue that Flanders Ventures had any interest in the Buffalo Properties and that Appellee's
     expert witness reported that the deed was a forgery.  Trial Order at 3 n.5; *see also* Pl. Trial Exh. 2
28   at 7-10.

United States District Court
Northern District of California

They alone executed the warranty deed to the buyer, which was recorded on September 21, 2007. Pl. Trial Exh. 28. The buyer paid for the properties by assuming $473,541.64 in existing debt, executing a new promissory note for $146,458.76, and assuming $70,000 in liabilities. In September 2009, after refinancing the properties and paying off the loans, the buyer sent a check for $190,751 payable to Rick only. Pl. Trial Exh. 37.

### ii. The Merrill Lynch Account

Rick deposited the check from the buyer of the Buffalo Properties into a Merrill Lynch account ending in 70343, which was held in both Rick's and Mary's name. *See* Trial Order at 4; Pl. Trial Exhs. 39. The bankruptcy court found that "Rick Louie exercised substantial control over the Merrill Lynch Account." Trial Order at 4. As the evidence showed, Rick and Stephanie used the Merrill Lynch account as their own personal account. On August 26, 2009, Rick and Stephanie deposited a $42,722.20 federal income tax refund into the account. Pl. Trial Exhs. 35, 39 at 5. Beginning in 2011, Rick and Stephanie deposited $15,000 a month into the account and wrote numerous checks on the account for personal or family expenses. Pl. Trial Exhs. 1 at 8, 85. By contrast, Mary had minimal involvement with the Merrill Lynch account, receiving about $1,200 per month through checks written on the account that were signed by Rick. Pl. Trial Exh. 1 at 575-95; *see* Trial Order at 4-5.

### iii. The 580 Parkson Road Deficiency Judgment

In October 2007, Rick and Stephanie purchased an investment property at 580 Parkson Road, Henderson, Nevada ("Parkson Property") through a limited liability company called Waiyan Ventures. Waiyan Ventures borrowed $2,650,000 to complete the purchase. In April 2009, Waiyan Ventures defaulted on the loan and the lender instituted foreclosure proceedings. On January 15, 2010, the property was sold in foreclosure. Thereafter, on January 19, 2010, the lender filed a complaint against Rick and Stephanie to recover a deficiency judgment. The lender ultimately recovered a judgment on this claim in the amount of $1,725,489.19. Trial Order at 5.

### iv. Purchase of the Tehama Property

On October 1, 2009, while the foreclosure on the Parkson Property was in progress, Rick negotiated the purchase of a promissory note from an unrelated entity called True Traditions, Inc.

secured by a lien on the Tehama Property.  Pl. Trial Exhs. 40, 42.  In the Loan Sale Agreement,

Rick designated an entity called Homer Ventures, LLC, to complete the purchase of the note.[5]

Homer Ventures, LLC paid $113,780.85 to purchase the promissory note ("Tehama Note").  The

money for this purchase came from the Merrill Lynch account.  Pl. Trial Exhs. 41, 83.  The

bankruptcy court noted that "there was no documentation to show whether Homer Ventures, LLC

borrowed the money from Rick Louie and his mother Mary, whether it intended to repay that

money, or whether it was some sort of investment by Rick Louie and his mother Mary."  Trial

Order at 6.  Several months later, "[i]n another transaction with opaque documentation," Homer

Ventures foreclosed on the Tehama Property and credit bid the loan balance in a foreclosure sale

on July 19, 2010.  *Id.*; Pl. Trial Exh. 48.  One day after the foreclosure sale, on July 20, Homer

Ventures recorded an assignment of its deed of trust on the property to Mary, who became the fee

owner of record.  Pl. Trial Exhs. 52, 53.

### v.  Rick's, Stephanie's, and Homer Ventures, LLC's bankruptcy cases

On May 5, 2011, Rick and Stephanie each filed petitions for chapter 7 bankruptcy.  Pl.

Trial Ex. 78.  Neither spouse disclosed the Merrill Lynch account as an asset.  On July 20, 2011,

the holder of the Parkson Property loan filed an adversary action against Rick and Stephanie to

deny their discharge for fraud.  *See 580 Parkson Road LLC v. Louie*, U.S. Bank. Ct. N.D. Cal.

A.P. No. 11-5217 SLJ.  On August 17, 2012, Homer Ventures, LLC filed a separate chapter 11

bankruptcy petition in the Santa Rosa division of the Northern District of California.[6]

The *580 Parkson Road* court held a two day trial on January 7 and 8, 2013 to determine

whether Rick and Stephanie should be denied a discharge.  ER Exh. 1 (Compl.) Exh. A.  That

court ultimately ruled that Stephanie would be allowed to discharge her debt but that Rick and

---

[5] As the bankruptcy court observed, "Homer Ventures, LLC, is itself an enigmatic entity."  Trial Order at 6.  Rick and Stephanie organized Homer Ventures in September 2003 and claimed, as late as April 2012, that they were the company's 100% owners.  Pl. Trial Exhs. 20, 71 at 168:8-23.  However, the membership agreement was amended in 2008 to make Mary a 50% owner.  Trial Order at 6.

[6] Appellees assert that Rick forum-shopped by using a Cotati, California mobile home owned by his bookkeeper as Homer Ventures' address and the basis for asserting a Santa Rosa venue.  Appellee Br. 7-8.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Homer Ventures should be denied a discharge due to Rick's "false oaths" in connection with both

2   his own bankruptcy case and that of Homer Ventures.  *Id.* at 19-21.  Critical to the court's

3   consideration was Rick's failure to disclose the Merrill Lynch account and the Tehama Property,

4   both indicative of a broader pattern of engaging in "countless transactions and in countless ways . .

5   . to make his interests and those of Homer Ventures opaque."  *Id.* at 20.

6               **vi.  Mary transfers the Tehama Property to Appellant**

7               On January 19, 2013, days after *580 Parkson Road* court tried the case but before it had

8   rendered its decision, Rick, in another bid to hide assets, prepared another grant deed whereby

9   Mary transferred her interest in the Tehama Property to "True Traditions, L.C." for no

10   consideration.  Three days later, Rick created the New Mexico limited liability company that is

11   now Appellant in this case and named himself manager.  Rick then recorded the grant deed from

12   Mary to Appellant on January 28, 2013.  Pl.'s Trial Exhs. 66, 67.  In deposition, Mary testified

13   that she knew nothing about any of her son's machinations in connection with the Tehama

14   Property.  *See generally* Pl. Trial Exhs. 73, 74.

15               The bankruptcy court reviewed this sequence of events and concluded that "[t]he timing,

16   the use of related entities, and the transparent attempt to keep his name off the property all show

17   fraudulent intent."  Trial Order at 13.

18          **C.   Trial Evidence**

19               In addition to extensive documentary evidence, the parties presented four witnesses in the

20   two-day bench trial before the bankruptcy court.  Appellees introduced the testimony and expert

21   reports of Jay Douglas Crom, an expert on accounting and insolvency issues, and M. Patricia

22   Fisher, a handwriting expert.  Pl. Trial Exh. 1 (Crom Report), Exh. 2 (Fisher Report).

23               Mr. Crom testified and confirmed his opinion from his report that he could not conclude

24   that the money used to purchase the Tehama Note came from the proceeds of the sale of Richard

25   Sr.'s and Mary's Sav-Mor Grocery in 2003.  Trial Tr. 15:21-16:10.  He explained that there had

26   been "extensive commingling" of funds between Rick, his wife, and his parents and that the funds

27   used to purchase the Tehama Note came from "numerous transactions that involved title changes"

28   as well as sources of money that were solely belonged to Rick and Stephanie.  *Id.* 16:11-17:1.

1   Furthermore, Mr. Crom testified that he examined the transaction papers that led to Mary being

2   recorded as the title owner of the Tehama Property and opined that there was no evidence Homer

3   Ventures received lawful consideration for that transfer.  *Id.* 17:4-18.  The bankruptcy court found

4   his report "helpful in laying out a factual background for the case" but disregarded Mr. Crom's

5   factual conclusions, which were "the court's province."  Trial Order at 7.

6          Ms. Fisher testified only long enough to be qualified as an expert and to authenticate her

7   report.  Trial Tr. 66:7-70:9.  In her report, Ms. Fisher opined regarding 28 signatures on

8   documents purported to be those of Mary Louie and concluded that the "vast majority" were not

9   her signature, but rather facsimiles or copies.  Trial Order at 7; Pl. Trial Exh. 2.  The only question

10  that Appellant asked on cross-examination was whether Ms. Fisher requested originals of the

11  documents that she examined and she acknowledged that she requested the originals but never

12  received them.  Trial Tr. 70:3-7.

13         Appellant introduced the testimony of William Higgins, the New York attorney who

14  represented the Louie family in the acquisition of the Buffalo Properties, as well as the testimony

15  and report of Howard Grobstein, an experienced chapter 7 trustee, who opined that the proceeds

16  from the sale of the Sav-Mor Grocery could be traced to the purchase of the Tehama Property.[7]

17         Mr. Higgins identified and explained certain documents involved in the 1031 exchange

18  involving the Sav-Mor Grocery and the Buffalo Properties.  He admitted that he never spoke to

19  Mary, did not know who made the money transfers involved in the transaction, and that he sent the

20  balance left over from the exchange to Rick and not to Mary.  Trial Tr. 93:9-10, 94:11-96:14.

21         Mr. Grobstein conducted tracing analysis to demonstrate that a significant portion of the

22  funds for the purchase of Tehama Property came from the proceeds of the sale of the Sav-Mor

23  Grocery.  *See* Trial Tr. 119:19-129:21.  He opined from his tracing analysis that Mary had an

24  equitable interest of approximately 83% to 85% in the Tehama Property.  *Id.* 131:2-6.  On cross-

25  examination, Mr. Grobstein admitted that he reviewed only the documents that Rick provided him

26  and that he had not seen the 2003 grant deed transferring interest in the Buffalo Properties from

27

28  [7] The Grobstein report was admitted as Defendant's Trial Exhibit B in the bankruptcy court, but it is not part of the designated record on appeal.

United States District Court
Northern District of California

9

Mary and Richard Sr. to Rick and Stephanie, nor had he seen the monthly checks that Rick wrote to Mary from the Merrill Lynch account. *Id.* 136:22-5, 143:8-144:8, 159:3-161:10. The bankruptcy court credited Mr. Grobstein's testimony but concluded that he was wrong. Trial Order at 7.

Neither Rick nor Mary testified at trial. Appellees did enter into evidence the transcripts from their prior depositions, including two depositions of Mary conducted on November 19, 2012 and March 6, 2014. Pl. Trial Exhs. 73 (11/19/12 Mary Louie Dep. Tr.), 74 (3/6/14 Mary Louie Dep. Tr.).

## II.    QUESTIONS PRESENTED

Appellant charges the bankruptcy court with a number of errors. The questions presented in this appeal, quoted from Appellant's opening brief, are as follows:

1. Did the Bankruptcy Court err in failing to apply state law presumptions of fraud, undue influence and void transfers when it found that Fiduciary Rick Louie took his Mother Mary Louie's ownership interest in Buffalo, New York properties sometime between 2003 and 2009?

2. Did the Bankruptcy Court err in failing to follow the pre-trial established law of the case that Appellant True Traditions, L.C. could adequately present Mary's Louie's [sic] claims, and then at trial refuse to allow True Traditions, L.C. to assert Mary's constructive trust claim?

3. Did the Bankruptcy Court err in failing to allow leave to intervene?

4. Did the Bankruptcy Court err when it asserted Appellant True Traditions, L.C. waived its right to have the Bankruptcy Court's findings of fact and conclusions of law reviewed by the District Court because Appellant filed a Cross-Motion for Summary Judgment after Appellant True Traditions objected to jurisdiction in its Answer, had its Motion for lack of jurisdiction denied, and though Appellant True Traditions, L.C. suggested the Summary Judgment ruling be treated as findings of fact and conclusions of law?

5. Did the Bankruptcy Court err when it failed to apply a preponderance of the evidence standard of review to Appellants tracing argument when it ruled that they must "conclusively" show Mary Louie's monies were the source funds for purchasing the Tehama property?

6. Did the Bankruptcy Court err in failing to enforce the Partnership Agreement?

United States District Court
Northern District of California

1    Appellant Br. at ii ("Questions Presented"), ECF 18.  The applicable standard of review on appeal

2    depends on whether the bankruptcy court properly entered final judgment.  As such, the Court

3    must address Appellant's fourth question—which this Court construes as a threshold challenge to

4    the bankruptcy court's authority to enter final judgment—first.  The Court therefore considers

5    Appellant's appeal issues in this more logical sequence: (1) whether the bankruptcy court had

6    consent to enter a final judgment (Question 4); (2) whether the bankruptcy court erred in

7    concluding that the Tehama Property is a part of Rick Louie's bankruptcy estate (Questions 1, 5,

8    and 6); and (3) whether the bankruptcy court erred in denying Mary Louie leave to intervene to

9    assert a constructive trust claim and whether it should have allowed Appellant to assert that claim

10   on Mary's behalf (Questions 2 and 3).

### III.    APPELLANT IMPLIEDLY CONSENTED TO THE BANKRUPTCY COURT'S ENTRY OF FINAL JUDGMENT.

13            In ruling on the parties' cross-motions for summary judgment, the bankruptcy court

14   concluded that Appellant had impliedly consented to the court's authority to enter final judgment

15   by (1) not objecting to Appellees' summary judgment motion based on the court's lack of

16   authority to enter final judgment and (2) filing its own cross-motion for final judgment in its favor.

17   MSJ Order at 4-5.  Appellant challenges that finding of implied consent on appeal.

18            The Court begins by observing that despite raising the issue in its "Questions Presented,"

19   Appellant's opening brief contains no argument addressing whether the bankruptcy court had

20   consent to enter a final judgment.  *See* Appellant Br. 14-20.  Appellant moreover fails to engage

21   with the different standards of review to explain what difference, if any, there would be in the

22   outcome of this appeal if the bankruptcy court did not have consent to enter final judgment.[8]  As

23   such, Appellant's opening brief fails to comply with Bankruptcy Local Rules 8010-2 and 9033-1.

24   However, because Appellees have substantively addressed the bankruptcy court's authority to

25   enter final judgment, and because Appellant takes the issue up again in reply, *see* Appellant Reply

26

27   ───────────────────

28   [8] Indeed, most of the issues that Appellant raises on appeal are questions of law or mixed questions of law and fact, which are subject to *de novo* review regardless of whether the bankruptcy court had consent to enter final judgment.

United States District Court
Northern District of California

14-15, ECF 25, the Court will address this threshold issue on the merits.

Fraudulent conveyance claims are "core proceedings" under 28 U.S.C. § 157(b)(2) that bankruptcy courts are expressly authorized to "hear and determine." *Id.* § 157(b)(1). While § 157(b)(1) also authorizes bankruptcy courts to enter final judgment on such proceedings, Article III of the Constitution proscribes that authority. Thus, bankruptcy courts may not, as a constitutional matter, enter final judgment in proceedings—even core ones—that do not "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 565 (9th Cir. 2012) *aff'd sub nom. Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014) (bankruptcy courts do not have "the general authority to enter final judgments on fraudulent conveyance claims asserted against noncreditors to the bankruptcy estate."). Such so-called *Stern* claims may, however, be heard and determined "in a manner consistent with the strictures of Article III." *Bellingham*, 702 F.3d at 565. This means that bankruptcy courts can hear *Stern* claims and submit proposed findings of fact and recommendations of law to the district court or enter final judgment with the parties' consent. *Id.*; *see also* 28 U.S.C. § 157(c)(1).

Consent need not be express. Because the authority of a bankruptcy court to enter final judgment is not an issue of subject matter jurisdiction but rather one of constitutional limitations, a party can waive its right to adjudication by an Article III court by impliedly consenting to the bankruptcy court's jurisdiction. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942-45 (2015). "[T]he implied consent standard articulated in [*Roell v. Withrow*, 538 U.S. 580, 590 (2003)] supplies the appropriate rule for adjudications by bankruptcy courts under § 157." *Id.* at 1948. The consent must be knowing and voluntary, as "*Roell* makes clear that the key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* (quoting *Roell*, 538 U.S. at 590); *see also Bellingham*, 702 F.3d at 567-70.

As recognized by a Ninth Circuit Bankruptcy Appeal Panel, "passive and unwitting participation is not sufficient for a finding of voluntary consent." *In re Pringle*, 495 B.R. 447, 461 (B.A.P. 9th Cir. 2013). "The Ninth Circuit, for example, has rejected implied consent where a pro

se plaintiff's initial act was to demand a hearing in the district court; the plaintiff proceeded with the magistrate judge only because she thought it was her only choice to obtain relief." *Id.* (citing *Anderson v. Woodcreek Venture Ltd.*, 351 F.3d 911, 919 (9th Cir. 2003)). On the other hand, the right to seek Article III adjudication can also invite litigation hijinks. Courts confronted with the thorny issue of implied consent to enter final judgment are finely attuned to the concerns of litigation misconduct and sandbagging identified in *Stern*. *Stern*, 131 S. Ct. at 2608. This concern is particularly acute where, as here, a party seeks affirmative relief from the bankruptcy court believing it might win and then cries foul over the court's entry of final judgment when it loses. *Bellingham*, 702 F.3d at 570; *see also In re Carter*, 506 B.R. 83, 88-89 (D. Ariz. 2014); *In re G & S Livestock Co.*, 478 B.R. 906, 917-18 (S.D. Ind. 2012); *In re Washington Coast I, L.L.C.*, 485 B.R. 393, 409-11 (B.A.P. 9th Cir. 2012).

Here, Appellant answered the original complaint admitting that the bankruptcy court had jurisdiction. Only after Appellees stipulated to dismiss Rick, Stephanie, and Mary from the action did Appellant file its motion to dismiss claiming a purported lack of jurisdiction. As the bankruptcy court properly found—a finding unchallenged by Appellant—jurisdiction was not in issue, only whether Appellant had consented to the bankruptcy court's entry of final judgment. *See* 3/31/14 Hr'g Tr. 6:9-18.

Appellant then filed a cross-motion for summary judgment affirmatively seeking judgment in its favor. The motion did not raise the issue of consent. *See* ER Exh. 12. Indeed, no party mentioned consent until the bankruptcy court revived the issue sua sponte on the record at the May 5, 2014 hearing on the parties' cross-motions for summary judgment. There, the bankruptcy court queried whether Appellant had impliedly consented to the bankruptcy court's entry of final judgment by filing a cross-motion for summary judgment. When Appellant's lawyer hedged, the bankruptcy court asked:

> Well then are you going to argue before the District Court that I didn't have authority to enter an order that you asked me to enter, and then just take another cut at that? It seems like you can't really do it that way, to me. You either have to decide I don't have the authority to enter a final order, which is – you know, that's okay to decide that – and at the end of the case, I'll decide what I'm going to do in terms of whether I enter a final order or propose – you know,

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

propose findings of fact and conclusions of law.  But I think when you in the middle of the case move for summary judgment, you're essentially inviting me to enter a final order.  If I entered an order on your motion, I would be doing exactly what you asked me to do, which seems to me to be consent.

4   5/5/14 Hr'g Tr. 4:9-22.  Appellant's response was twofold.  First, it argued that it felt it had to

5   bring a motion for summary judgment because Appellees filed one.  This argument was properly

6   rejected by the bankruptcy court because Appellant sought affirmative relief in its cross-motion

7   rather than merely oppose Appellees' motion.  *Id.* 4:23-6:15.  Second, Appellant appeared to

8   suggest that the bankruptcy court could enter proposed findings of fact and conclusions of law on

9   the parties' cross-motions for summary judgment.  The bankruptcy court properly rejected that

10  notion on the basis of *In re Healthcentral.com*, 504 F.3d 775 (9th Cir. 2007), and the bankruptcy

11  court's authority to dispose of pre-trial matters.  *Id.* 7:9-8:13.  The only evidence of its continued

12  objection to the bankruptcy court's authority to enter of final judgment that Appellant is able to

13  point to is this colloquy from the summary judgment hearing.  Appellant Reply 14-15.

14          The bankruptcy court did not err in concluding that Appellant's actions constituted implied

15  consent to its authority to enter final judgment.  Appellant was aware of the need to consent and

16  challenged the bankruptcy court's jurisdiction earlier in the proceeding (after initially admitting

17  the court's jurisdiction).  When it came time for summary judgment, however, Appellant sought

18  final judgment in its favor without ever mentioning consent.  Appellant argues that "if not allowed

19  to bring a Cross-Motion for Summary Judgment, how else could Appellant True Traditions, L.C.

20  seek a summary decision on the findings of fact?  There is no statutory basis to file a Cross-

21  Motion for Summary Judgment for findings of fact?"  Appellant Reply 15.  Indeed, there is no

22  such thing as a motion for summary *judgment* for *findings* of fact, as the summary judgment

23  standard requires that the facts not be in dispute.  Fed. R. Civ. P. 56(a), as incorporated by Fed. R.

24  Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  More fundamentally,

25  Appellant did not seek a finding that certain facts were not in dispute.  Rather, it sought *judgment*

26  as a matter of law in its favor that the funds used to purchase the Tehama Property could be traced

27  to the proceeds from the sale of Richard Sr.'s and Mary's Sav-Mor Grocery.  *See* ER Exh. 12 at 2.

28          The unmistakable implication from Appellant's motion is that it sought an entry of final

1    judgment in its favor.  *See* 5/5/14 Hr'g Tr. 5:20-6:15.  Courts confronted with this situation have

2    time and again concluded that the movant had impliedly consented to the bankruptcy court's

3    authority to enter final judgment.  *Bellingham*, 702 F.3d at 570; *Carter*, 506 B.R. at 88-89; *G & S*

4    *Livestock*, 478 B.R. at 917-18; *Washington Coast I*, 485 B.R. at 409-11.  Without a doubt, had

5    Appellant prevailed, it would have been happy to see the bankruptcy court enter final judgment in

6    its favor.  Instead, Appellant lost.  "Having lost before the bankruptcy court, [Appellant] cannot

7    assert a right it never thought to pursue when it still believed it might win."  *Bellingham*, 702 F.3d

8    at 570.  "In such cases, as here, the consequences of a litigant 'sandbagging' the court—remaining

9    silent about his objection and belatedly raising the error only if the case does not conclude in his

10   favor—can be particularly severe."  *Stern*, 131 S. Ct. at 2608 (internal quotation marks,

11   alterations, and citations omitted).  Here, the consequence of Appellant's decision to seek

12   summary judgment in its favor, and of failing to raise the issue of consent in either its opposition

13   to Appellees' summary judgment motion or its own affirmative motion, is the appropriate finding

14   that Appellant consented to the bankruptcy court's authority to enter final judgment.

15            That Appellant asked the bankruptcy court to enter proposed findings of fact and

16   conclusions of law *after* the court raised the issue of consent sua sponte does not detract from this

17   conclusion.  By filing an affirmative motion for summary judgment, Appellant had already

18   consented to entry of final judgment by the bankruptcy court.  In order to maintain its objection to

19   the bankruptcy court's authority, Appellant could have withdrawn its motion for summary

20   judgment.  After the bankruptcy court's summary judgment order issued, Appellant could have

21   filed a motion to withdraw its consent.  Appellant remained silent, proceeding through trial and

22   post-trial briefing without raising the issue of consent again until this appeal.  *See* ER Exhs. 15,

23   18.  As such, Appellant's reliance on the colloquy from the summary judgment hearing to

24   demonstrate an absence of consent is inapposite.  If anything, it is merely more evidence of

25   Appellant's adoption of a series of inconsistent positions when it suited its purpose: first admitting

26   jurisdiction, then challenging it; seeking judgment from the bankruptcy court in its favor, then

27   claiming lack of consent only when the bankruptcy court raised the issue; finally proceeding to

28   trial on the merits (again without raising consent) and then seeking relief from this Court based on

1    a purported lack of consent after losing on the merits.  Given this course of conduct, Appellant has

2    waived the right to seek final judgment by an Article III court.

3          In sum, the Court finds that the bankruptcy court did not err in concluding that Appellant,

4    through the filing of an affirmative motion for summary judgment in its favor, had impliedly

5    consented to that court's entry of final judgment.  Thus, to the extent this appeal implicates any of

6    the bankruptcy court's findings of fact, those findings are subject to the "clear error" standard of

7    review.[9]

8    **IV.    THE BANKRUPTCY COURT DID NOT ERR IN CONCLUDING THAT THE**
           **FUNDS USED TO PURCHASE THE TEHAMA PROPERTY ARE AN "INTEREST**
9          **OF THE DEBTOR [RICK] IN PROPERTY."**

10         **A.    Legal Standard**

11         District courts employ the same standard of review of bankruptcy court decisions as do

12   circuit courts in reviewing the decisions of the district court.  *See, e.g.*, *Ford v. Baroff (In re*

13   *Baroff)*, 105 F.3d 439, 441 (9th Cir. 1997).  Findings of fact are reviewed for clear error, while

14   conclusions of law are reviewed de novo.  *In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004).  On a

15   clear error review of the bankruptcy court's findings of fact, those findings should not be disturbed

16   unless "the court is left with the definite and firm conviction that a mistake has been committed."

17   *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009).

18         Mixed questions of law and fact are reviewed de novo.  *In re Chang*, 163 F.3d 1138, 1140

19   (9th Cir.1998); *see generally In re JTS Corp.*, 617 F.3d 1102, 1109 (9th Cir. 2010).  Because the

20   bulk of Appellant's appeal implicates conclusions of law or mixed questions of law and fact, the

21   Court has reviewed the bankruptcy court's findings and conclusions de novo.

22         **B.    Discussion**

23         Appellant does not challenge the bankruptcy court's findings of undisputed facts at

24   summary judgment, which includes the finding that Appellant is not a "good faith transferee" as

25   the term is used in 11 U.S.C. § 550(b).  MSJ Order at 10.  Nor does it appear to challenge the

26

27   ───────────────
     [9] In any case, the Court has reviewed the evidentiary record de novo and agrees with the
28   bankruptcy court's recitation of the facts.

United States District Court
Northern District of California

1    court's ultimate conclusion that the transfer of the Tehama Property from Homer Ventures to

2    Appellant was conducted with actual intent to defraud and, as such, constituted an avoidable

3    fraudulent conveyance.  Trial Order at 13-14.  Instead, Appellant first, fifth, and sixth arguments

4    on appeal can best be characterized as evidentiary challenges to the bankruptcy court's conclusion

5    that the Tehama Property was purchased using funds that were an "interest of the debtor [Rick] in

6    property."  *Id.* at 12-13.  If that conclusion was proper, then the Bankruptcy Court's determination

7    that the subsequent transfer in ownership is an avoidable fraudulent conveyance stands.

8         Thus properly focused, Appellant advances three challenges to the bankruptcy court's

9    determination that the Tehama Property was acquired using funds from the debtor's (Rick's)

10   estate: (1) that the court held Appellant to the wrong burden of proof to prove tracing (Question

11   5); (2) that the court should have applied a presumption of undue influence to the 2003 grant deed

12   concerning the Buffalo Properties (Question 1); and (3) that the court should have enforced the

13   2003 Partnership Agreement among Rick, Stephanie, Richard, and Mary (Question 6).  The Court

14   rejects each of these challenges.

### i.  The bankruptcy court did not apply the incorrect burden of proof to Appellant's tracing argument.

17        Funds from a commingled bank account in the debtor's control are presumed to be

18   property of the debtor's estate.  *Danning v. Bozek (In re Bullion Reserve of North America)*, 836

19   F.2d 1214, 1217 (9th Cir. 1988).  However, "funds held by a debtor in constructive trust for

20   another person" wherein "the equitable interest in the trust funds belongs to the trust beneficiary,

21   not the debtor" are not part of the bankruptcy estate.  *In re Advent Mgmt. Corp.*, 104 F.3d 293, 295

22   (9th Cir. 1997) (citing *In re Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir. 1994)).  "State

23   law determines whether a trust exists in federal bankruptcy proceedings."  *Bullion Reserve*, 836

24   F.2d at 1217.  Under California law, an express trust can be created in several ways but requires

25   the settlor to "properly manifest[] an intention to create a trust."  Cal. Prob. Code § 15201.  A

26   constructive trust may also be imposed on property if that property is "wrongfully detain[ed],"

27   Cal. Civ. Code § 2223, or gained "by fraud, accident, mistake, undue influence, the violation of a

28   trust, or other wrongful act," *id.* § 2224.  In either instance, a party asserting an equitable interest

United States District Court
Northern District of California

17

1   in property that presumptively belongs to the debtor's estate bears the burden of "tracing the

2   alleged trust property 'specifically and directly'" back to the act that created the trust. *Advent*, 104

3   F.3d at 296; *Bullion Reserve*, 836 F.2d at 1218; *see also In re Goldberg*, 158 B.R. 188, 196

4   (Bankr. E.D. Cal. 1993) *aff'd*, 168 B.R. 382 (B.A.P. 9th Cir. 1994) ("Strict tracing requires a

5   creditor to demonstrate that the property subject to the constructive trust was specifically and

6   directly exchanged for the property sought to be recognized as trust property.").

7          At trial, Appellant's main defense to Appellees' claim under 11 U.S.C. § 548 to avoid the

8   fraudulent transfer of the Tehama Property to Appellant was its argument that the funds used to

9   purchase the Tehama Property were not "an interest of the debtor [Rick] in Property" and thus not

10  subject to the trustees' avoidance power.  This was because, as argued by Appellant, the money

11  used to purchase the Tehama Note actually belonged to Mary and could be traced to the proceeds

12  from the sale of the Sav-Mor Grocery store in 2003.[10]  Appellant thus bore the burden of

13  demonstrating specific and direct tracing.

14         Appellant contends that the bankruptcy court applied an incorrect burden of proof on

15  tracing based solely on one sentence from the court's post-trial order.  After explaining that

16  Appellees had demonstrated Rick's interest in the Tehama Property sufficient to shift the burden

17  to Appellant to prove tracing, the court stated: "In other words, [Appellant] must show

18  _____

19  [10] The Court pauses to observe that it is not entirely clear what trust theory Appellant presented at
    trial.  As the bankruptcy court already noted in denying Mary's motion to intervene, a constructive

20  trust requires tracing to a wrongful act.  Appellant's trial brief asserts in one sentence that "Rick
    was a trustee for Mary's monies" and concludes that "If Plaintiff Trustees are correct that Homer

21  Ventures, LLC or Rick are the true owners of the Tehama property, than [sic] this suggests Rick
    committed a fraud, mistake or other wrongful act as her trustee in converting Mary's monies into

22  assets belonging to him or Homer Ventures, LLC. ER Exh. 15 (TT Trial Brief) at 14-15.  The
    bulk of the brief is devoted to a somewhat inapposite discussion regarding whether Rick's and

23  Stephanie's bankruptcy attorney had a conflict of interest with Mary.  At trial, Appellant only
    introduced testimony regarding tracing the proceeds of the sale from the Sav-Mor Grocery to the

24  funds used to purchase the Tehama Property and thus appears to have been pursuing an express
    trust theory of tracing.  On appeal, Appellant maintains that the bankruptcy court should have

25  imposed a *constructive* trust on the Tehama Property because of some purported wrongdoing
    perpetrated by Rick along the way.  *Compare* TT Answer ¶ 11 ("the funds for purchase of this

26  note came from sale of Mary Louie's grocery store") and *id.* ¶ 14 ("Mary Louie was not paid
    consideration because she owned the property and 100% of True Traditions.  Homer Ventures was

27  a facilitator of a trust action by way of son's financial power of attorney.") *with* Appellant Br. 4
    ("the Complaint allegations indicate either mistake, negligence, fraudulent conduct, or some other

28  wrong by Rick in using Mary's monies to acquire properties in the names of other entities, and
    then failing to show the Bankruptcy Court that she was the true owner of the asset").

United States District Court
Northern District of California

*conclusively* that the money in the account belonged to Mary Louie." Trial Order at 12 (emphasis added). Appellant takes from this verbiage that the bankruptcy court placed on it a greater burden of proving tracing than by a preponderance of the evidence. Appellant Br. 16-17. That contention is meritless.

"Conclusively" is not an evidentiary standard found in modern legal usage, as demonstrated by Appellant's reliance on Black's Law Dictionary and cases from before the turn of the 20th century. *See* Appellant Br. 17 (citing "The Law Dictionary Featuring Black's Law Dictionary Free Online Legal Dictionary 2nd Ed. Law Dictionary"; *Hoadley v. Hammond*, 63 Iowa 599, 19 N.W. 794 (1884); and *Bixler's Appeal*, 59 Cal. 550 (1881)[11]). There is no suggestion from the record that the bankruptcy court used the term "conclusively" to convey such an archaic burden of proof. Rather, the unfortunate word choice appears to have been a colloquial manner of stating that tracing must be proven "specifically and directly," which is indisputably the standard for tracing in the Ninth Circuit. *Advent*, 104 F.3d at 296. In fact, the bankruptcy court cited to the correct legal authorities in articulating this standard. *See* Order Following Trial at 8 (citing *Bullion Reserve*, 836 F.2d at 1217 and *Advent*, 104 F.3d at 296).

Other than the quoted sentence from the bankruptcy court's order, Appellant identifies nothing else in the record to suggest that the bankruptcy court deviated from the preponderance of the evidence standard and instead applied the archaic "conclusive evidence" standard. Appellant moreover does not attempt to demonstrate in any way that the outcome should have been different had the bankruptcy court applied a preponderance of the evidence standard. Nor can it, because the record amply supports the bankruptcy court's conclusion that Appellant failed to carry its burden of demonstrating strict and direct tracing.

At trial, the issue came down to a battle of the experts. Appellees' expert, Jay Crom, submitted a report that detailed "Rick Louie's financial empire" and opined that he could not conclude that the money used to purchase the Tehama Note came from the proceeds of the sale of Richard Sr.'s and Mary's Sav-Mor Grocery in 2003. Pl. Trial Exh. 1; Trial Tr. 15:21-16:10. The

---

[11] Incorrectly cited in Appellant's brief as a case from 1907.

United States District Court
Northern District of California

bankruptcy court found this testimony credible but properly reserved for itself the actual factual conclusions that could be drawn from the evidence.  Trial Order at 7.  By contrast, the testimony of Appellant's expert, Howard Grobstein, was determined by the bankruptcy court to be creditable but wrong.  *Id.*  Notably, at trial, Appellees elicited admissions from Mr. Grobstein that he formed his opinion regarding tracing based upon documents provided to him by Rick, that Rick had not shown him the two grant deeds executed by Mary and Richard Sr. transferring their interests in the Buffalo Properties to Rick and Stephanie, and that Rick never told him about Rick's monthly payments to Mary from the Merrill Lynch account.  Trial Tr. 136:22-5, 143:8-144:8, 159:3-161:10.  These admissions significantly undermine the accuracy of Mr. Grobstein's opinion, and the bankruptcy court appropriately afforded his opinion no weight.

Ultimately, the bankruptcy court concluded that Appellant's tracing argument was "inconsistent with the record developed at trial" and proceeded to detail all of the evidence adduced at trial showing that "whatever interest Mary Louie had in the Buffalo Properties was terminated sometime between 2003 (when she executed the first deed) to 2009 . . . ."  Trial Order at 12-13.  Appellant does not challenge this conclusion on appeal.[12]  Thus, even had the bankruptcy court applied an incorrect burden of proof for tracing—and there is no indication that it did—the error would be harmless because the evidence simply does not support a theory of tracing.  *See Kennedy v. S. California Edison Co.*, 268 F.3d 763, 770-71 (9th Cir. 2001) (harmless error applies to a trial court's error in allocating burden of proof).

### ii. The bankruptcy court was not required to apply a presumption of undue influence.

Appellant next charges the bankruptcy court with error in refusing to apply a presumption of undue influence to a number of transactions that led to the Tehama Property's current ownership, including (1) the 2003 grant deed whereby Mary and Richard Sr. transferred their interests in the Buffalo Properties to Rick and Stephanie; (2) the purchase of the Tehama Note in

---

[12] As explained below, to the extent Appellant appears to seek reversal of this conclusion through its contention that the bankruptcy court erred in failing to apply a presumption of undue influence or to enforce the 2003 Partnership Agreement among Richard Sr., Mary, Rick, and Stephanie, those contentions are meritless.

United States District Court
Northern District of California

1    Homer Ventures, LLC's name; and (3) the transfer of title in the Tehama Property from Mary to

2    Appellant.  Appellant Br. 14-16.  Appellant claims that a presumption was warranted because

3    Mary is elderly, that she was in a "fiduciary/confidential relationship" with Rick and trusted her

4    money to him, had little or no knowledge of the transfers, and because there was evidence in the

5    record of Rick's prior fraudulent conduct, including his filing of false oaths with the bankruptcy

6    court.  The Court finds no merit in this argument.

7            First and foremost, Appellant did not raise the undue influence argument until its closing

8    remarks *after* the presentation of evidence.  *See* Appellee Br. 20; Trial Tr. 193:10-22.  The theory

9    that Appellant asserted and presented at trial was that the funds from the Merrill Lynch account

10   used to purchase the Tehama Property could be traced back to Mary's and Richard Sr.'s sale of the

11   Sav-Mor Grocery store and that Rick held those funds in trust.  *See* ER Exh. 5 (Answer to

12   Complaint-in-Intervention); Exh. 12 (TT's Cross-Mot. for Summary J.); Exh. 15 (TT's Trial

13   Brief); *see also* Defendants' Case Management Statement, A.P. No. 13-5062 SLJ, ECF 21 (filed

14   9/19/2013) ("Mary's Monies Purchased Tehama Property.  Debtors/Defendants core theory is that

15   a straightforward accounting will show that Mary's Louie's [sic] monies from the $280,000 sale of

16   her Grocery Store in Williams, CA were transferred into a Merrill Lynch account.  Monies were

17   then transferred out of the Merrill account to purchase the subject San Francisco Tehama

18   property.").  Rick's purported exercise of undue influence over Mary in securing the transfer of

19   the Buffalo Properties or in any other transaction was not raised or even hinted at until the close of

20   evidence at trial.  This new theory rests not on the contention that the funds to purchase the

21   Tehama Property were always Mary's, but rather on an implicit concession that she did relinquish

22   her interest to Rick, but that the grant should be voided as a matter of public policy.  *See* 6/9/14

23   Trial Tr. 191:19-24.  The bankruptcy court appropriately pointed out that Appellant's undue

24   influence argument presented "a totally different lawsuit."  *Id.* 195:23.  As even Appellant's own

25   cited authority explains, it is highly improper for an appellant to advance a new theory after trial

26   where the facts essential to the theory are in dispute.  *Strasberg v. Odyssey Grp.*, Inc., 51 Cal.

27   App. 4th 906, 920-21 (1996).  As such, the bankruptcy court would not have abused its discretion

28   had it simply refused to consider Appellant's untimely undue influence argument.  *Accord*

21

1    *Strasberg*, 51 Cal. App. at 920.

2           Furthermore, Appellant introduced no evidence at trial that would warrant the imposition

3    of an evidentiary presumption based upon elder abuse or undue influence.  Appellant cites to

4    California Civil Code § 1575 and a bevy of case law discussing the presumption of undue

5    influence in will contests.  In the case of conveyances inter vivos, a party seeking the presumption

6    of undue influence must present evidence of "the susceptibility to imposition, the extreme age and

7    infirmity, of the grantor," together with "slight evidence of circumstances from which it may be

8    inferred that the instrument was the product of coercion."  *O'Neil v. Spillane*, 45 Cal. App. 3d 147,

9    155 (Ct. App. 1975) (citing *Longmire v. Kruger*, 80 Cal. App. 230, 238 (1926)).  Here, Appellant

10   produced no evidence demonstrating that Mary is or was infirm or lacking in mental vigor to

11   protect herself against Rick's imposition.  *See Longmire*, 80 Cal. App. at 237.

12          Mary was in her early seventies when she executed the 2003 grant deed transferring her

13   interest in the Buffalo Properties to Rick and Stephanie.[13]  She testified in deposition that she was

14   and is of sound mind and body.  She also testified that she gave money to Rick and Stephanie with

15   no expectation that they would give the money back.  Pl. Trial Exh. 74 (3/6/14 Mary Louie Dep.

16   Tr.) 31:9-11.  In 2013, the bankruptcy court presiding over the *580 Parkson Road* adversary

17   proceeding found that "Mary Louie, who is eighty years old and appears to be of sound mind and

18   body, is completely unaware of the myriad financial dealings her son Richard Louie carries out,

19   nominally in her name."  ER Exh. 1 (Compl.) Exh. A ¶ 28.  Even at trial in this case, Appellant's

20   counsel acknowledged that Mary would not sue her son.  Trial Tr. 201:2-6.  There was thus no

21   basis for presuming that Rick—Richard Sr.'s and Mary's only child—had obtained ownership of

22

23

24   [13] Mary testified in 2014 that she would be 82 on March 25th of that year, placing her in her early
     seventies in 2003.  *See* Pl. Tr. Exh. 74 (3/6/14 Mary Louie Dep. Tr.) at 44:19.  Appellant
25   acknowledges that as of the date of its reply brief, Mary was 82 years old.  Appellant Reply 6.  For
     some reason, the proposed Complaint-in-Intervention that Mary attempted to file in February of
26   2014 alleges that she was born in 1925, which would have made her 78 in 2003.  *See* Proposed
     Compl.-in-Intervention ¶ 1, A.P. No. 13-5062 SLJ, ECF 46-1 (filed Feb. 19, 2014).  The Court
27   assumes that this latter assertion was a drafting error on the part of Mary's attorney (also
     Appellant's counsel in this case), as all of the other evidence in the record indicates that Mary is
28   presently in her eighties and was therefore in her early seventies in 2003.

the Buffalo Properties through undue influence.[14]  *Cf. Stewart v. Marvin*, 139 Cal. App. 2d 769, 775 (1956) ("extreme age and infirmity of the grantor" together with "slight evidence of circumstances" from which coercion could be inferred sufficient to shift burden to grantee to affirmatively show that transaction was fair and free from influence); *Beckmann v. Beckmann*, 174 Cal. App. 2d 717, 722 (1959) (applying presumption where grantor was nearly 80 years of age and "in a weak mental condition due to advanced senility").

Appellant's argument that the bankruptcy court found wrongdoing by finding that "Rick Louie took the proceeds from the sale" of the Buffalo Properties is unpersuasive.  *See* Appellant Br. 15 ("The badges of fraud identified by the Court in its Trial Ruling also point to Rick's *taking* Mary's Buffalo properties assets, since the Bankruptcy Court found he took her assets." (emphasis in original)); Trial Order at 13.  The bankruptcy court made no such finding.  A fair reading of the bankruptcy court's order following trial indicates that it merely found, on the basis of the numerous opaque transactions that Rick engaged in using his mother as a figurehead, that Mary's interest in the Buffalo Properties terminated sometime between 2003 and 2009.  *See* Trial Order at 13 ("the court concludes that whatever interest Mary Louie had in the Buffalo Properties was terminated sometime between 2003 (when she executed the first deed) to 2009, when Rick Louie took the proceeds from the sale.").  This finding was not erroneous, even when reviewed de novo.

Insofar as Appellant contends that it was entitled to a presumption of undue influence based upon the evidence, a presumption merely shifts the burden to the grantee or beneficiary to prove the absence of undue influence.  *See* Appellant Br. 14.  The "grantee" of the Buffalo Properties in this instance was Rick, who clearly has no interest in assisting Appellees to void his own fraudulent transfer.  More to the point, even had it been appropriate to apply such a

---

[14] As Appellees also appropriately point out, this undue influence argument fails to account for the fact that Richard Sr. also signed the grant deeds transferring his interest in the Buffalo Properties to Rick and Stephanie.  Appellee Br. 20.  The Court also finds no evidentiary basis for presuming undue influence in connection with any of the later transactions that Rick carried out in Mary's name, as she appears to have been largely unaware of those transactions.  Because this Court agrees with the bankruptcy court that Mary lost whatever interest she had in the Buffalo Properties sometime between 2003 and 2009, the transactions involving the Tehama Property were carried out using funds from the debtor's (Rick's) estate, even if he appended his mother's name to the papers in an effort to conceal his involvement.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   presumption to place the burden on Appellees to demonstrate Rick's lack of undue influence over

2   his mother, Appellees had no opportunity to present any rebuttal evidence at trial because it had no

3   notice of the argument until after trial.  It would thus be fundamentally unfair to hold, as Appellant

4   urges, that "Appellees failed to overcome the presumption that the transfers of Mary [sic] assets to

5   others were the result of fraud, undue influence, and presumptively void."[15]  Appellant Br. 16.

6           In conclusion, the bankruptcy court did not err in rejecting Appellant's untimely and

7   unwarranted attempt to bring what would essentially be a "totally different lawsuit" in the guise of

8   an evidentiary presumption.  As explained below, regardless of the (questionable) merits of the

9   undue influence and constructive trust arguments, the bankruptcy court likewise did not err in

10  concluding that Appellant—a New Mexico company—could not bring such a claim on Mary's

11  behalf.  *See* Trial Order 14.

12          **iii.  The bankruptcy court did not err in disregarding the 2003 Partnership**
            **Agreement.**

14          In challenging the bankruptcy court's conclusion that the Tehama Property was purchased

15  using funds from Rick's bankruptcy estate, Appellant also ascribes error to the bankruptcy court's

16  decision to disregard the one-page Partnership Agreement dated February 27, 2003 and signed by

17  Richard Sr., Mary, Rick, and Stephanie.  Pl. Trial Exh. 9; *see* Appellant Br. 18-19.  It is not clear

18  what relevance the Partnership Agreement has in light of the bankruptcy court's conclusion,

19  affirmed by this Court, that the subsequent grant deed in June 2003 terminated Mary's interest in

20  the Buffalo Properties.  In any case, the bankruptcy court did not err in disregarding the

21  Partnership Agreement because the undisputed evidence established that Mary did not sign the

22  agreement.  *See* Trial Order at 3-4.

23          Appellant contends that "[t]here was no evidence [Mary's] signature was a forgery" and

24  that "Appellees' Expert Handwriting Expert [sic] did not opine that any of the documents with

---

[15] The Court moreover rejects Appellant's suggestion that Rick's prior filing of false oaths before the bankruptcy court should count toward a finding that he obtained ownership of the Buffalo Properties through fraud.  *See* Appellant Br. 15.  It is undisputed that Rick incorporated Appellant and is its designated manager.  To allow Rick's prior fraud upon the bankruptcy court to inure to his benefit now would be an affront to basic notions of fundamental fairness.

United States District Court
Northern District of California

1   Mary's name signed on them were forgeries." *See* Appellant Br. 18.  The record wholly belies

2   these contentions.  Ms. Fisher opined in her report that "Q-1 through Q-8 are fabricated documents

3   containing the same signature that has been transposed onto each of these documents."  Pl. Trial

4   Exh. 2 at 8.  "Q-2" is the Partnership Agreement.  *Id.* at 4.  The only conclusion that can be drawn

5   from this unrebutted opinion is that the Partnership Agreement is not enforceable because Mary's

6   signature on the document was faked.  To the extent Appellant would argue that copying and

7   pasting Mary's signature onto a document is not a "forgery," that distinction is absurd.

8   Furthermore, to the extent Appellant contends that Mary "authorized Rick to act on her behalf,"

9   Appellant Br. 18, there is no evidence in the record of such blanket authorization to apply her

10  signature to the number of documents that Ms. Fisher concluded were fabricated.  Appellant's

11  reliance on Mr. Crom's report stating that Mary trusts her son implicitly is not evidence of

12  authorization to copy and paste her signature on documents she had not seen.  *See id.*  The

13  bankruptcy court thus appropriately rejected the Partnership Agreement.

14              **iv.  Conclusion**

15          In conclusion, the bankruptcy court did not apply an incorrect burden of proof in

16  concluding that Appellant had failed to demonstrate strict and direct tracing of the proceeds from

17  the sale of the Sav-Mor Grocery to the funds used to purchase the Tehama Property.  Nor did the

18  bankruptcy court err in disregarding the 2003 Partnership Agreement urged by Appellant or in

19  rejecting Appellant's dilatory assertion of undue influence.  Because there was no error in the

20  bankruptcy court's findings of fact and conclusions of law, the Court AFFIRMS the bankruptcy

21  court's conclusion that the funds used to purchase the Tehama Property were an "interest of the

22  debtor [Rick Louie] in property."

23  **V.    THE BANKRUPTCY COURT DID NOT ERR IN DENYING MARY LOUIE'S
        MOTION TO INTERVENE**
24

25          Finally, the Court turns to Appellant's argument that the bankruptcy court erred in denying

26  Mary Louie's motion to intervene as a plaintiff in this case and that the court further erred in

27  refusing to allow Appellant to assert a constructive trust claim on Mary's behalf.  Appellant Br.

28  17-18.

United States District Court
Northern District of California

1   The Court, as an initial matter, agrees with Appellees that Appellant does not have

2   standing to appeal the denial of Mary's motion to intervene.  Appellee Br. 1-2.  That Appellant has

3   inexplicably identified Mary as an "appellant" in this case does not make her one.  In any event,

4   even assuming that Mary is a proper appellant in this action, her appeal is untimely because the

5   bankruptcy court denied her motion to intervene on April 1, 2014, a final order that she did not

6   appeal within the time proscribed by the Federal Rules of Bankruptcy Procedure.  ER Exh. 10;

7   Fed. R. Bankr. P. 8002(a).  Appellant has no rejoinder to Appellees' standing and timeliness

8   arguments.  As such, the Court concludes that the bankruptcy court's denial of Mary's motion to

9   intervene is barred from appellate review.  *Wiersma v. Bank of the West (In re Wiersma)*, 483 F.3d

10  933, 938 (9th Cir. 2007).

11      Turning to Appellant's contention that the bankruptcy court improperly refused to allow

12  Appellant to assert a constructive trust claim on Mary's behalf, that argument rests on an imperfect

13  understanding of the bankruptcy court's order denying Mary's motion to intervene.  Appellant

14  appears to believe that it is "law of the case" that it could "adequately present Mary Louie's

15  claims."  Appellant Br. at ii (Question 2).  There is no such law of the case.  Appellant in its

16  opening brief quotes extensively the same passages from the March 31, 2014 motion hearing that

17  this Court quoted above.  *See supra* Part I.A; Appellant Br. 5-6.  In denying Mary's motion to

18  intervene, the bankruptcy court stated again and again that Mary had no legally protectable interest

19  in the Tehama Property, whether as the 100% owner of Appellant True Traditions, LC or pursuant

20  to a constructive trust theory.[16]  3/31/14 Hr'g Tr. 13:16-19, 14:13-17, 14:21-24.  If anything, these

21  findings are "law of the case."

22      Appellant ignores all of these findings to focus solely on the bankruptcy court's conclusion

23  that "there is no evidence that Mary has presented that her interests would not be protected by

24  [Appellant's counsel]."  *Id.* 15:22-24.  That "interest," however, is merely the "same ultimate

25  objective of keeping the property, the Tehama property, out of the bankruptcy estate and the hands

26  of the Plaintiff Trustees."  *Id.* 15:13-17.  As such, the bankruptcy court made no ruling that

27

---

28  [16] At the time that Mary sought to intervene, she did not assert undue influence or any wrongful act by Rick.  3/31/14 Hr'g Tr. 13:21-14:15.

Appellant could bring claims on Mary's *behalf*, only that Appellant and Mary shared the same objective.  As the bankruptcy court itself explained during trial, this was not leave for Appellant to bring, for example, a tort claim on Mary's behalf.  Trial Tr. 193:5-9.  Mary's constructive trust claim would be hers individually, not that of Appellant True Traditions.

There was thus no error or inconsistency in the bankruptcy court's conclusion that Appellant could not assert a constructive trust in the Tehama Property on Mary's behalf.  Trial Order at 14.  That claim must be left for "a totally different lawsuit."  Trial Tr. 195:23.

## VI.    ORDER

For the foregoing reasons, the findings and conclusions in the bankruptcy court's July 14, 2014 Order Following Trial, as well as the bankruptcy court's July 28, 2014 Judgment Avoiding Fraudulent Transfer are AFFIRMED.  The Clerk of the Court shall enter judgment and close the case file.

**IT IS SO ORDERED.**

Dated: September 8, 2015

BETH LABSON FREEMAN
United States District Judge